# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| HAGOP HADJIAN, individually, and on behalf of a class of similarly situated individuals,<br><br>Plaintiff,<br><br>v.<br><br>MERCEDES-BENZ USA, LLC, a New Jersey corporation,<br><br>Defendant. | **Civil Action No.:**<br><br>**DEMAND FOR JURY TRIAL** |

1.     Plaintiff Hagop Hadjian ("Hadjian") brings this action for himself and on behalf of all persons in California and the United States who purchased or leased any 2016-present AMG Model[1] vehicle designed, manufactured, marketed, distributed, sold, warranted, and/or serviced by Mercedes-Benz USA, LLC ("Mercedes," "MBUSA," or "Defendant") ("Class Vehicles").  Plaintiff alleges as follows:

## INTRODUCTION

2.     This is a consumer class action concerning a failure to disclose material facts and a safety concern to consumers.

3.     Mercedes Benz USA, LLC manufactured, marketed, distributed, and/or sold the Class Vehicles without disclosing that the Class Vehicles were designed with defectively designed front bumper covers and air inlets.

4.     The Class Vehicles are defective in that their front bumper covers and air inlets allow rocks, pebbles and/or other road debris to enter and damage the Class Vehicles' aluminum radiators, causing cooling system leaks, insufficient coolant system pressure, and overheating, which causes head warping and ultimately catastrophic engine failure (the "Inlet Defect").

5.     The Inlet Defect is inherent in each Class Vehicle and was present at the time of sale.

6.     MBUSA knew of the Inlet Defect through pre-production testing, pre-production design failure mode analysis, design failure mode analysis, calls to its customer service hotline, and customer complaints made to dealers, aggregate warranty data compiled from those dealers, repair order and parts data

---

[1] AMG GT Vehicles, AMG C43 Vehicles, AMG C63 Vehicles, AMG CLS63 Vehicles, AMG E43 Vehicles, AMG E63 Vehicles, AMG S63 Vehicles, AMG S65 Vehicles, AMG SL63 Vehicles, AMG SL65 Vehicles, AMG SLC43 Vehicles, AMG SLC63 Vehicles, G550, AMG G63 Vehicles, AMG G65 Vehicles, AMG GLC43 Vehicles, AMG GLC63 Vehicles, AMG GLE43 Vehicles, AMG GLE63 Vehicles, and AMG GLS63 Vehicles.

received from the dealers, consumer complaints to dealers and to the National Highway Traffic Safety Administration ("NHTSA"), and testing performed in response to consumer complaints. However, this knowledge and information was exclusively in the possession of MBUSA and its network of dealers and, therefore, unavailable to consumers.

7.    Precursor models to the Class Vehicles in years prior to the 2016 model year, were equipped with metal-wire mesh or injection-molded ABS plastic to protect the aluminum radiators from damage caused by rocks, pebbles and/or other road debris. Therefore, MBUSA was aware that a protective covering was needed to protect against the Inlet Defect.

8.    The Inlet Defect is material because it poses a serious safety concern. As attested by Class Members in complaints to the NHTSA, and other online forums, the Inlet Defect can impair any driver's ability to control his or her vehicle and greatly increase the risk of collision, including causing overheating and catastrophic engine failure.

9.    In fact, on May 19, 2019, MBUSA finally admitted the existence of the Inlet Defect in two Class Vehicle models – E-Class Models and GLC-Class Vehicles, through Service Campaign 2019040010, which stated that "Daimler AG ("DAG"), the manufacturer of Mercedes-Benz vehicles, has determined that on certain Model Year ("MY") 2018-2019 E-Class and GLC-Class (213, 253 platform) vehicles, the installed stone chip guard does not correspond to current production specifications. As a result, this may allow stones to contact the radiator."

10.    In essence, the Inlet Defect can be easily addressed through implementation of a simple protective guard or grill that is sufficient to prevent damage from rocks, pebbles and/or other road debris. Based on the cost of available third party vendor guards or grills, the cost to MBUSA for the

implementation of such a protective guard would be de minimis.

11.    Nevertheless, the Inlet Defect is also material because consumers will incur significant and unexpected repair costs that could reach upwards of $80,000.00 to replace damaged engines. MBUSA's failure to disclose, at the time of purchase or lease, the Inlet Defect is material because no reasonable consumer expects to spend thousands, if not tens of thousands, of dollars to repair or replace engines or essential engine components, including radiators.

12.    Had MBUSA disclosed the Inlet Defect, Plaintiff and Class Members would not have purchased or leased the Class Vehicles or would have paid less for them.

## THE PARTIES

### Plaintiff Hagop Hadjian

13.    Plaintiff Hadjian is a California resident who resides in Woodland Hills, California.

14.    On or around July 31, 2016, Plaintiff Hadjian purchased a new 2016 Mercedes-Benz AMG C63S from Mercedes-Benz of Encino, an authorized MBUSA dealer in Encino, California.

15.    Plaintiff Hadjian purchased his vehicle primarily for personal, family, or household use.

16.    Passenger safety and reliability were important factors in Plaintiff Hadjian's decision to purchase his vehicle. Before making his purchase, Plaintiff Hadjian researched the Mercedes-Benz AMG C63S online, including on the MBUSA website. During his research, he viewed YouTube videos for the vehicle and reviewed the dealership website. At the dealership, Plaintiff Hadjian also reviewed the vehicle's Monroney Sticker or "window sticker" which listed official information about the vehicle, and test drove the vehicle with a salesperson. None of these sources made reference to the Inlet Defect. Plaintiff

Hadjian believed that the vehicle would be a safe and reliable vehicle.

17.    MBUSA's omissions were material to Plaintiff Hadjian. Had MBUSA disclosed its knowledge of the Inlet Defect before he purchased his vehicle, Plaintiff Hadjian would have seen and been aware of the disclosures. Furthermore, had he known of the Inlet Defect, Plaintiff Hadjian would not have purchased his vehicle, or would have paid less for it.

18.    Within the first year of purchasing his vehicle, in or around March of 2017, at approximately 9,000 miles, Plaintiff Hadjian noticed that his vehicle was leaking fluid and a warning appeared informing him that his radiator was not functioning properly.

19.    On March 27, 2017, Plaintiff Hadjian delivered his vehicle to Mercedes-Benz of Encino, an authorized MBUSA repair facility, complaining that his vehicle suffered from a coolant leak, that he found fluid on his garage floor, and that a low coolant warning was illuminated. The dealership personnel "PERFORMED COOLANT PRESSURE TEST. FOUND INTERCOOLER FOR LOW CIRCUIT TURBO SYSTEM HAS A TINNY (sic) HOLE FROM ROAD SOME MATERIAL. ESTIMATE PROVIDED. CUSTOMER DECLINED REPAIR, CLIENT WAS ADVISED THE (sic) THIS COULD CAUSE MORE DAMAGE EVEN TO THE ENGINE IF NOT REPAIRED." Despite the fact that the car was less than one year old and had only 9,000 miles on it, the repairing dealership informed Plaintiff Hadjian that MBUSA would not cover the leak under warranty and that he would have to pay out of pocket to repair his vehicle.

20.    Thereafter, on March 31, 2020, Plaintiff Hadjian delivered his vehicle to a different MBUSA authorized dealership, Keyes European in Van Nuys, California, which agreed to cover the labor costs for replacing the low temp turbo radiator in his vehicle but charged him $1,050.00 for the repair.

21.    Despite bringing his vehicle to the MBUSA dealerships—MBUSA's

authorized agent for repairs—Plaintiff Hadjian has not received a repair under warranty, and his vehicle continues to exhibit the Inlet Defect because no appropriate guards or covers are in place to prevent the Inlet Defect from again resulting in radiator and/or engine failure in his vehicle.

22.    At all times, Plaintiff Hadjian, like all Class Members, has driven his vehicle in a manner both foreseeable and in which it was intended to be used.

**Defendant**

23.    Defendant Mercedes-Benz USA, LLC is a corporation organized and in existence under the laws of the State of New Jersey, headquartered in the State of Georgia and registered to do business in the State of California. MBUSA's Corporate Headquarters are located at 1 Mercedes-Benz Dr., Sandy Springs, GA 30328.  MBUSA designs, manufactures, markets, distributes, services, repairs, sells, and/or leases passenger vehicles, including the Class Vehicles, nationwide, and in California. MBUSA is the warrantor and distributor of the Class Vehicles in the United States.

24.    At all relevant times, MBUSA was and is engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and/or selling automobiles and motor vehicle components in California, Georgia, and throughout the United States of America.

<strong>JURISDICTION</strong>

25.    This is a class action.

26.    Members of the proposed Class are citizens of states different from the home state of Defendant.

27.    The aggregate claims of individual Class Members exceed $5,000,000.00 in value, exclusive of interest and costs.

28.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d).

5

## VENUE

29.     MBUSA maintains its U.S. corporate headquarters in Atlanta, Georgia such that personal jurisdiction is appropriate under 28 U.S.C. § 1391. Further, Defendant is deemed to reside in this district pursuant to 28 U.S.C. § 1391 (d) because its corporate headquarters are in this district.

## FACTUAL ALLEGATIONS

30.     Since the summer of 2015, if not earlier, MBUSA has designed, manufactured, distributed, sold, and/or leased the Class Vehicles. MBUSA has sold, directly or indirectly, through dealers and other retail outlets, thousands of Class Vehicles in California and nationwide. MBUSA warrants and services the Class Vehicles through its nationwide network of authorized dealers and service providers.

31.     Unbeknownst to purchasers, the Class Vehicles are defective in that their front bumper covers and air inlets allow rocks, pebbles and/or other road debris to enter and damage the Class Vehicles' aluminum radiators, causing cooling system leaks, insufficient coolant system pressure, and overheating, which causes head warping and ultimately may lead to catastrophic engine failure (the "Inlet Defect"). The Inlet Defect is inherent in each Class Vehicle and was present at the time of sale.

32.     MBUSA knew of the Inlet Defect through pre-production testing, pre-production design failure mode analysis, design failure mode analysis, calls to its customer service hotline, and customer complaints made to dealers, aggregate warranty data compiled from those dealers, repair order and parts data received from the dealers, consumer complaints to dealers and NHTSA, and testing performed in response to consumer complaints.  However, this knowledge and information was exclusively in the possession of MBUSA and its network of dealers and, therefore, unavailable to consumers.

33.     The Inlet Defect is material because it poses a serious safety concern. As attested by Class Members in complaints to the NHTSA and other online forums, the Inlet Defect can impair any driver's ability to control his or her vehicle and greatly increase the risk of collision, including causing overheating and catastrophic engine failure.

34.     On May 19, 2019, MBUSA finally admitted the existence of the Inlet Defect in two Class Vehicle models – E-Class Models and GLC-Class Vehicles, through Service Campaign 2019040010, which stated that "Daimler AG ("DAG"), the manufacturer of Mercedes-Benz vehicles, has determined that on certain Model Year ("MY") 2018-2019 E-Class and GLC-Class (213, 253 platform) vehicles, the installed stone chip guard does not correspond to current production specifications. As a result, this may allow stones to contact the radiator."

35.     Below are exemplary pictures reflecting the lower front air intake and inlet on an undamaged Class Vehicle. The picture reflects a lack of any protective guard for the radiator.





36.    Below is a picture reflecting the lower front air intake and inlet on a Class Vehicle that has suffered from the Inlet Defect. The picture reflects a lack of any protective guard for the radiator.



37.    Other Class Vehicles, as evidenced by the photograph below, are equipped with "egg-crate" style guards that are insufficient to protect the aluminum radiators. These vehicles suffer from the same Inlet Defect as vehicles with no protective guards at all because the guards are insufficient to protect against rocks, pebbles and/or other road debris from entering and damage the Class Vehicles' aluminum radiators.



**The Inlet Defect Poses a Serious Safety Concern**

38.    The Inlet Defect is dangerous, causing cooling system leaks, insufficient coolant system pressure, and overheating, which causes head warping and ultimately may lead to catastrophic engine failure. In turn, the Inlet Defect can cause the Class Vehicles to overheat, shut down, or stall while driving, which severely impairs the driver's control and increases the risk of collisions.

39.    Plaintiff Hadjian has had the unnerving experience of his vehicle leaking fluid and a warning appearing, informing him that his radiator was not functioning properly, while driving.

**MBUSA Had Superior and Exclusive Knowledge of the Inlet Defect**

40.    Since 2015, if not earlier, MBUSA has designed, manufactured, distributed, sold, and/or leased the Class Vehicles. However, prior to 2015, MBUSA distributed, sold, and/or leased the precursors to the Class Vehicles, which unlike the Class Vehicles, were equipped with protective guards and/or

mesh grills to prevent damage causes by rocks, pebbles and/or other road debris.

41.     Federal law requires automakers like MBUSA to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See TREAD Act,* Pub. L. No. 106-414, 114 Stat.1800 (2000).

42.     Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id.*

43.     Complaints posted by consumers in internet forums demonstrate that the defect is widespread and dangerous and that it can manifest without warning and/or suitable repair. The complaints also indicate MBUSA's awareness of the problems with the bumper covers and air inlets and how potentially dangerous the defect is for consumers. The following are a sample of consumer complaints (spelling and grammar mistakes remain as found in the original):

   a. **May 15, 2018:** Just wondering if anyone else has had this issue??? A semi pull out in front of me on the highway on Sunday and covered my car in debris from its trailer. I got stuck behind him briefly till I could get out into another lane and away from all the crap he sprayed all over the road and my car. I washed the car later that day to find red coolant on the garage floor. Initially I thought the radiator had been punctured so I went and got the system pressure tested. On inspection we found that the small coolant reservoir on top of the engine in front of the turbos had emptied out. The radiator guy topped it up and pressure tested it to find a pin hole leak in the cooler that sits vertically in front of the radiator (Is this the water to air transmission cooler?). I have

heard from a mate that these coolers have been damaged on a number of cars from similar situations. All three of my coolers are now now heavily dented from this debris. Any thoughts on repair, warranty, upgrade replacements and mods on how we can stop debris from damaging our coolers. (*Available at* https://mbworld.org/forums/c63-c63s-amg/707679-damaged-coolers-road-debris.html)

b. **May 15, 2018:** Well, to start off, I have had my car at the dealer 5 times now, trying to diagnose a rich coolant smell that I am getting when I pull back in my garage, typically after a spirited drive. They replaced turbo inlet lines, o rings, pressure tested, compression tested, and nothing. They dyed the coolant systems (hi and lo) and had me run a thousand miles to UV check afterwards. Nothing. I finally called Renntech, as Hartmut, the owner came from AMG, and after speaking to him, he said that he spoke with a guy in Germany at AMG, who mentioned to check the lower intercoolers, since they may have a pinhole leak caused by rock chips from the road surface. The guy told him that they have had numerous issues with this in Germany, as there is no real protective screening to speak of in front of these units, and that the lower right hand intercooler was the more common, as it is the side closest to the accumulated debris, etc., at the side of the road. Hartmut said that perhaps AMG might be working on some sort of retrofit solution. Ironically, I was so hoping that this was in fact my problem, as upon hearing this, my dealer replaced both on mine, but after another 1000 miles, the smell is still there and in 1000 miles, that small resevoir was 1/4 in lower in coolant than before. (*Id.*)

c. **May 24, 2018:** Had this exact thing happen to me earlier this year while on a trip out of state. I was on a back highway with a horribly patched

part of asphalt on the other aide of the road. An 18 wheeler hit it and threw asphalt pieces all over the front of my car. I first noticed something mechanically was wrong a few hours later when I got close to my destination. My transmission oil temp started running high. Normally it is steady at 183F, but it stayed steady at 190F instead and would climb when I slowed down from highway speed. Got up to low 220s when I finally got to the hotel. I called up my mechanic right away, and he and I tried to remotely diagnose the car. For whatever reason I initially didn't think about the asphalt pieces maybe causing it, and when I looked at the reservoir on top the engine it didn't look empty because a bit of a bit of residual coolant caught in the front corner. My mechanic first thought it could be one of the two pumps going bad. He said they are cheap POS pumps and break all the time. By that point though, I noticed the front radiator was wet. Found a piece of asphalt basically melted to the radiator, almost like it hit and the molded/formed to the radiator, mostly patching the hole that it had made. I pretty much had a slow leak the entire way to my destination that finally went dry right before I got there. We didn't find the leak location until everything cooled off and the asphalt piece popped off when I tried to refill the resevoir. It was pretty noticeble too; a stream of water was shooting out thw front grille directly onto my foot. To onlookers I'm sure it looked like Herbie from The Love Bug peeing on someone's foot. According to my mechanic, the low-temp circuit that was hit is a pretty weird design because it ties the transmission cooler line and the air intercooler line into the same circuit. He said other than the high transmission temps I should have also felt a pretty noticeable drop in power because of the inability to cool the intake air. The ECU would have gone into a soft

safe mode to prevent damage. He said that more than likely wouldn't have thrown a CEL but would have been recorded where he'd have been able to read it. Had to leave my car for a week at an out-of-state dealer waiting on parts. They ended up covering it under warranty. Even my mechanic didn't expect them to do it. But they did. I told them pretty much the same story as above, so it's not like they didn't know what caused it. But for whatever reason they covered it. That being said, they did do a crappy job otherwise. My front bumper was crooked (not bad, bit nociteable), and they cleaned up none of the coolant mess left by the leak. Not only that, they didn't bleed it properly either and had to deal with bubbles belching coolant out the relief hole all over the top of my engine for several weeks after I got the car back. (*Id.*)

d. **May 30, 2018:** I called MBUSA this morning and spoke to a rep. I then got a call back from an executive referral manager later on in the day to hear my complain. I stated that the damage is a common occurance on our vehicles and MBUSA should look at the issue and try to assist its customer. He then called the service manager at my dealership and got back to me with the advice to file it as an insurance claim and then let him know my deductable cost, which he can then try to get MBUSA to cover. I'm not satisfy with this recommendation as it does not cover much of the cost of the repair, but more importantly, it does not address the design issue, which, more then likely, could cause this damage to happen again in the future. I recommend more owners with this issue reach out to MBUSA to get enough noise to get their attention to make them take more actions. Here's the number: 1 (800) 367-6372, ext #8520 is one of Roman, the manager that I spoke with. (*Id.*)

e. **May 30, 2018:** I have the same damage on my 2017 coupe. Dealership

is quoting $1,800 to get radiator replaced. I'm trying to get MBUSA to cover this but we'll see how it goes. Anyone else have luck with getting it covered under warranty? (*Id.*)

f.  **October 3, 2018:** Perusing this thread when i noticed a leak out of my C63 that i suspected to be coolant.... and low and behold i have a pinpoint puncture on my radiator that is gonna cost me $2200 to get fixed. Dealer is telling me to go through my insurance to get fixed (which... whatever)... but i'm worried that this will happen again. Anyone come up with definitive "fixes" for this? Anyone have any luck getting warranty to cover this? (*Id.*)

g.  **January 30, 2020:** This is my second 2017 C63 S Edition 1 Coupe, and I already paid $1,747.37 in 2018 (when I had the first car) to replace the coolers due to road debris. Now I'm in the same hole AGAIN, and they're asking $2200 for replacement of the trans cooler due to a pinhole leak from road debris. I'M PISSED. I just tried reaching Roman, but it said that rep is unavailable. So I spoke to another rep, who's gonna reach out to an Executive Manager, and I'm supposed to hear back in 24 hours. Hopefully I get some positive response like some of the others have... In the meantime, I sent Dru from ARE Cooling an email per RDO247's suggestions, to hopefully mitigate this from happening again in the future... (*Id.*)

h.  **June 12, 2016:** Hi All, Just learned there's completely nothing between the bottom front bumper and the radiator to block rocks from hitting the radiator. It's completely exposed to damages. Is my car missing a part? The grill isn't well-designed - the openings are too large. Has anyone tried to address this at dealer or installed something like this? http://www.driveaccord.net/forums/51...ctor-mesh.html, Steve.

(*Available at* https://mbworld.org/forums/glc-class-x253/628628-radiator-exposed.html)

i.   **February 22, 2019:** if you have a pre-2019 AMG E63 .. you need to walk out and check to see if you have the plastic guards that go over your exposed radiators.. my car had the two outer ones but not the center radiator. And of course it got punctured. Save yourself the hassle... and $2300. The middle grill cover's part number is 099-503-01-00 $33.00 (I don't have the part numbers for the outer grills) I believe it can be installed without removing the nose of the car. (*Available at* https://mbworld.org/forums/w213-amg/736647-oem-radiator-guard-must-have.html)

j.   **February 22, 2019:** Hello, Get the grill protectors from Zunsports. I got them and installed them in a few minutes. Just as important as keeping rocks and ballistic objects from puncturing your cooling heat exchangers, it also prevents build up of leaves and debris. I had my E63S for about 1 week, and I actually had to vacuum out leaves and road debris before I installed them. I have 2000 miles on now, and the heat exchangers are free from damage and debris. Well worth it. Cheers. (*Id.*)

k.   **February 22, 2019:** Experienced the same issues and did exactly the same and had the same result. Definitely worth doing. (*Id.*)

l.   **February 26, 2019:** As I mentioned in previous threads, my late year 2018 has these useless plastic strips and my radiator was still punctured at just under 2k miles. My SA felt bad (and I didn't even purchase the car from this dealership), and got Mbrace to pay for half of the $1900 charge, as well as throwing in the 2k differential change - but still!!! (*Id.*)

16

m. **January 9, 2019:** Has this happened to anybody else? I don't trust the dealer/service advisor that diagnosed the issue. They are telling me rocks from the highway can randomly puncture the intercooler/heat exchange and Mercedes will not cover the damage as it is external wear and tear. I don't understand what the odds are statistically that makes this car safe to drive if it can easily be cracked by rocks on the highway? Any advice is appreciated. Thank you! (*Available at* https://mbworld.org/forums/w213-amg/732427-2-000-repair-rock-chip-front-intercooler-heat-exchanger.html)

n. **July 31, 2019:** I just had the same issue with my 2018 C63S last week. Road debris punctured my lower right radiator. Lucky for me, my dealership covered it under warranty. (*Id.*)

o. **November 11, 2018:** Hey everyone, I noticed a pink puddle of coolant under my car, probably a half a cup or so. It was located more towards the rear of the engine. Has anyone else had or heard of a coolant leak issue? Service appointment is already set up... Thanks! Bueller (*Available at* https://mbworld.org/forums/w213-amg/726756-i-have-coolant-leak.html)

p. **December 19, 2018:** i just woke up this morning to a pool of coolant on my garage floor as well. Tech just sent me a pic of it being a rock hit to the radiator (center cooler). No idea how much this costs, but the frequency at which this happens on this car seems to be at least a few standard deviations from normal. Makes me want to sell the car. (*Id.*)

q. **November 24, 2019:** So last night coming out of dinner I had a low coolant warning come on my dash. I checked under the vehicle, no puddles, and didn't think anything of it because I just had my car transferred up north so I thought possibly the climate change was

causing an issue. Fast forward to this morning the same warning illuminated when I turned the car over. I backed it up to check under the hood and sure enough a massive pool of coolant was sitting there, probably all of it. To make matters worse my car is sitting on the 3rd floor of a parking garage and I don't want to turn the vehicle over and risk engine damage for driving it out. MB Roadside's 3rd party urgent.ly can't properly dispatch anyone to go in and get the vehicle out, and no flat bed will make the clearance. At this point I am just going to call into the service department when they open at 7:30 and see what they suggest. If they say its OK to turn it over and drive it down (<5min) that's what I'll do. Last time I was getting an oil change my service adviser mentioned there was a TSB on our vehicles for the mesh lining to protect the radiator. I am almost positive when this thing gets to the dealer they are going to tell me it sucked up a rock or some other piece of debris that punctured or damaged the radiator. With an active TSB bulletin for this fix, do you think this repair is something I should fight with them about being covered by MB? I know this happened with a GS350 I had almost 3 years ago and I had to pay that repair. Has anyone else became a casualty of this yet and maybe have something to report on? (*Available at* https://mbworld.org/forums/w213-amg/763377-coolant-leak-tsb-19-e63.html)

r. **November 26, 2019:** So the recall applies to both the far left and far right sides for vertical radiator protection. my puncture was in the lower center on the flat radiator and they told me it does not apply to me. $843 otd. boo hoo. (*Id.*)

s. **January 7, 2021:** Just had the same issue Rock hit my driver side Aux Radiator Wasn't driving crazy or tailgating I didn't even know I had a

leak until I found coolant all over the garage Ray Catena of Edison
$1300 repair most of it labor. I called Mercedes and complained about
only having 4k miles and the bumper design of the AMG's and how
exposed the radiators are. They covered parts. Better than nothing. I
ended up taking that $300 they saved me and brought Zunsport grill
inserts Hopefully I wont have this issue again. Just unfortunate we
spend all this money on our cars, we clear bra and ceramic coat to
protect the paint, just to have the radiator destroyed by a pebble. (*Id.*)

t.  **October 8, 2020:** As many of you know who own this car. Rocks
hitting the heat exchanger or the trans coolers on the either side of the
car is a very bad day! Yesterday, it was my day to experience this
problem. After driving I noticed the transmission temperature rapidly
climbing to 220 degrees and instantly knew there was a problem. Pulled
over let the car cool down and drove back. Luckily wasn't far away.
When I got home. I put down some cardboard to find where the leak
was coming from. To my surprise it was in the front of the vehicle not
the sides. I looked around and found the spot where a rock hit the pipe
on the radiator. I made a call to a private shop and Mercedes. Quote
from the private shop was $1300 for new heat exchanger and install.
Mercedes told me they wanted "a few thousand to do the job". I
watched some videos and found one where a guy used JB weld to fix
the radiator. Figured it was worth a shot. Hit the small hole with some
JB weld and let it cure overnight. This afternoon fired the car up got it
to temperature and filled it with additional coolant. To my surprise it
actually worked. No leaks and temperatures are steady at 176 degrees
with hard driving. I'll do the radiator next summer since the car is going
to sit all winter. Hope this helps. (*Available at*

19

https://mbworld.org/forums/c63-c63s-amg/796278-rock-hit-front-heat-exchanger-cheap-fix.html)

u. **April 9, 2018:** So I know all about "wear and tear", Im a seasoned highline car guy and know I must pay to play.. However, this issue is disheartening and I fear this to be a often reoccurring issue due to poor design. A road pebble hit my intercooler and puntured it. Day 7 of ownership at 700 miles, still in the "break in" period. After seeing fluid and smelling leak I drove it straight to dealer. They let me know a rock had punctured intercooler already and I need to pay $2500 to fix it due to it being non-warranty part, like a damaged windshield or rim would be considered. I asked my dealers GM to assist me, as I have a good relationship with him. He tried. I even contacted MB Headquaters and the "escalated" call to executive referral customer service, who offered me a $500 credit for repair. Ok, thank you for the offer MB. I appreciate it. However, Im in sandy Charleston SC and we have pebbles amd debris as bad as anywhere. At this rate, we are potentially talking $9000 a month in non warranty repairs on my brand new car. Because without a permanent resolution, like a mesh insert to protect the intercoolers and components, this is going to happen over and over. The critical components to the drive train should be well protected against reasonable road debris and wear and tear. Otherwise, you have a track only car. Ive browsed the interwebs and mb forums and have seen this issue described and it seems this is reoccurring alot. Is there a recommend fix that wont effect intercooler effeciency? Is there another method thats better to contact MB tech side to discuss a fix, not so much a hand out or free repair, but an actual preventative repair and will put my mind at ease? I travel each week to Charlotte and back and our

Carolina roads are riddled with debris, requiring 3M paint protectant film on my other cars to keep front ends from getting sandblasted. So this adds another obstacle. What to do, what to do... On another note, looking forward to getting my downpipes and brabus ecu upgrade soon... Right after I invest in custom fab mesh inserts I guess :-/ .... Wish they had caught this, its gonna end up costing alot of new owners unexpected $$$... So goes the love/hate automotive relationship, and "Its Complicated"... (*Available at* https://mbworld.org/forums/w213-amg/704101-got-my-new-e63s-last-week-already-needs-2500-intercooler.html)

v.  **April 9, 2018:** Hi HH, Welcome to the forum and sorry to hear about your situation. I'm also in Charleston, and my driver's side intercooler gave up the ghost a couple of weeks ago. However mine was a defective part so Baker replaced it under warranty. It is indeed a design flaw of these cars that the bumper ducts don't have a protective mesh to protect the intercoolers. There's thread about people trying to find a fix, although so far as I can tell no 'off the shelf' solution has come of it yet: https://mbworld.org/forums/w213-amg/...-catchers.html I and many others would be all over an aftermarket part that solves this problem. (*Id.*)

w.  **May 26, 2018:** Just happened again on interstate. 2nd time in weeks, under 2500 miles.. what crap... (*Id.*)

x.  **October 29, 2017:** Yesterday when I stopped for gas on the way to Florida I started pulling leaves and all sorts of things out of the intercooler housings and the radiator housing, these things pick up all sorts of road debris, even pulled out part of a orange parking light lens I probably picked up in NY. At least in Florida it will probably be only

occasional palm tree debris. There were a lot of leaves on the road in New England with the trees shedding. If I were to do that type of driving a lot I'd think about putting mesh screen over these openings. (*Available at* https://mbworld.org/forums/w213-amg/687245-wow-all-these-openings-nose-car-debris-catchers.html)

y. **October 30, 2017:** These openings are a BIG PROBLEM. Not just hypothetically, but in fact. My car was 6 days old, driving on a very clean highway in October (ie. ideal conditions). A 1/2 inch stone popped onto the small rad on the passenger side, puncturing the radiator. Got a low coolant warning. Rad needed replacement. Fortunately I was near a gas station so I could buy anti freeze and keep topping it up to allow me to get to a safe spot. All 3 rads in the front are way too exposed. My solution (ugly though it is, as I was in a hurry) is shown on the attached photo. Mercedes is irresponsible for allowing this car to go out this way. It's a bloody everyday driving car, not some garage queen that ill never be driven (and as my car demonstrated , it only took 6 days in perfect driving conditions to puncture the aluminum rad). By the way, both my C63 and AMG GTS have protective grills on their corresponding openings - see photo -silver car is my GTS). (*Id.*)

44.    MBUSA had superior and exclusive knowledge of the Inlet Defect and knew or should have known that the defect was not known or reasonably discoverable by Plaintiff and Class Members before they purchased or leased the Class Vehicles.

45.    Plaintiff is informed and believes, and based thereon alleges, that before Plaintiff purchased his Class Vehicle, and since 2015, MBUSA knew about the Inlet Defect through sources not available to consumers, including pre-release testing data, early consumer complaints to MBUSA and its dealers,

testing conducted in response to those consumer complaints, high failure rates, and other aggregate data from MBUSA dealers about the problem. Additionally, through its authorized dealerships, MBUSA interacted with Class Members directly and responded to complaints regarding the Inlet Defect.

46.    MBUSA is experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer, MBUSA conducts tests, including pre-sale durability testing, on incoming components, including the bumper covers and air inlets, radiators and engines, to verify the parts are free from defect and align with MBUSA's specifications.[2] Thus, MBUSA knew or should have known the bumper covers and air inlets were defective and prone to put drivers in a dangerous position due to the inherent risk of the Inlet Defect.

47.    Additionally, Defendant should have learned of this widespread defect from the sheer number of reports received from dealerships. MBUSA's customer relations department, which interacts with individual dealerships to identify potential common defects, has received numerous reports regarding the Inlet Defect, which led MBUSA to direct repair tips and suggestions to its technicians, including Service Campaign 2019040010. Consumers' online posts, a sample of which are set forth above, indicate that these do not remedy the defect. MBUSA's customer relations department also collects and analyzes field data including, but not limited to, repair requests made at dealerships, technical reports prepared by engineers who have reviewed vehicles for which warranty coverage is being requested, parts sales reports, and warranty claims data.

48.    Further, Defendant should have learned of this widespread defect from the sheer number and cost of engine and radiator replacements for the Class

---

[2] Akweli Parker, *How Car Testing Works*, HOWSTUFFWORKS.COM, http://auto.howstuffworks.com/car-driving-safety/safety-regulatory-devices/car-testing.htm ("The idea behind car testing is that it allows manufactures to work out all the kinks and potential problems of a model before it goes into full production.") (last viewed June 5, 2019).

Vehicles.

49.     Defendant's warranty department similarly analyzes and collects data submitted by its dealerships to identify warranty trends in its vehicles. It is Defendant's policy that when a repair is requested under warranty the dealership must provide MBUSA with detailed documentation of the problem and a complete disclosure of the repairs required to correct it. Dealerships have an incentive to provide detailed information to Defendant, because they will not be reimbursed for any repairs unless the justification for reimbursement is sufficiently detailed.

50.     The existence of the Inlet Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a Class Vehicle.  Had Plaintiff and other Class Members known of the Inlet Defect, they would have paid less for the Class Vehicles or would not have purchased or leased them.

51.     Reasonable consumers, like Plaintiff, expect that a vehicle's bumper covers, air inlets, radiators, and engines are safe, will function in a manner that will not pose a safety risk, and are free from defects. Plaintiff and Class Members further reasonably expect that MBUSA will not sell or lease vehicles with known safety defects, such as the Inlet Defect, and will disclose any such defects to its consumers when it learns of them. They did not expect MBUSA to conceal and fail to disclose the Inlet Defect to them, and to then continually deny its existence.

**MBUSA Has Actively Concealed the Inlet Defect**

52.     Despite its knowledge of the Inlet Defect in the Class Vehicles, MBUSA actively concealed the existence and nature of the defect from Plaintiff and Class Members. Defendant has acted or refused to act on grounds that apply generally to the Class or Subclasses. Specifically, MBUSA failed to disclose or

actively concealed at and after the time of purchase, lease, or repair:

    (a)    any and all known material defects or material nonconformity of the Class Vehicles, including the Inlet Defect;

    (b)    that the Class Vehicles, including the radiators, bumper covers and air inlets, were not in good working order, were defective, and were not fit for their intended purposes; and

    (c)    that the Class Vehicles and their radiators, bumper covers and air inlets were defective, despite the fact that MBUSA learned of such defects as early as 2015.

53.    When consumers present their Class Vehicles to an authorized MBUSA dealer for repairs, rather than repair the problem under warranty, MBUSA dealers either inform consumers that the failure is the consumers' fault, was caused by outside influence, directs them to consumers' insurance company, or conduct repairs that merely mask the Inlet Defect.

**MBUSA Has Unjustly Retained A Substantial Benefit**

54.    Defendant unlawfully failed to disclose the alleged defect to induce Plaintiff and other putative Class Members to purchase or lease the Class Vehicles.

55.    Plaintiff further alleges that Defendant thus engaged in deceptive acts or practices pertaining to all transactions involving the Class Vehicles, including Plaintiff's purchase of his vehicle.

56.    Defendant unlawfully induced Plaintiff to purchase his Class Vehicle by concealing a material fact (the Inlet Defect). Plaintiff would have paid less for the Class Vehicle, or not purchased it at all, had he known of the defect.

57.    Accordingly, Defendant's ill-gotten gains, benefits accrued in the form of increased sales and profits resulting from the material omissions that did - and likely will continue to - deceive consumers, should be disgorged.

## CLASS ACTION ALLEGATIONS

58.    Plaintiff brings this lawsuit as a class action on behalf of himself and all others similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2), 23(b)(3) and 23(c)(4). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

59.    The Class and Sub-Classes are defined as:

> **Class**:    All individuals in the United States who purchased or leased any Class Vehicle.
>
> **California Sub-Class**:  All members of the Class who reside in the State of California.
>
> **CLRA Sub-Class**:  All members of the California Sub-Class who are "consumers" within the meaning of California Civil Code § 1761(d).
>
> **Song-Beverly Sub-Class**: All members of the Class who purchased or leased their vehicles in the State of California.

60.    Excluded from the Class and Sub-Classes are:  (1) Defendant, any entity or division in which Defendant has a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) any Judge sitting in the presiding state and/or federal court system who may hear an appeal of any judgment entered; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein.  Plaintiff reserves the right to amend the Class and Sub-Class definitions if discovery and further investigation reveal that the Class and Sub-Classes should be expanded or otherwise modified.

61.    Numerosity:  Although the exact number of Class Members is uncertain, and can only be ascertained through appropriate discovery, the number is significant enough such that joinder is impracticable. The disposition of the

claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. The Class Members are readily identifiable from information and records in Defendant's possession, custody, or control, as well as from records kept by the Department of Motor Vehicles.

62.    <u>Typicality</u>:  Plaintiff's claims are typical of the claims of the Class in that Plaintiff, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, and/or distributed by MBUSA. The representative Plaintiff, like all Class Members, has been damaged by Defendant's misconduct in that he has incurred or will incur the cost of repairing or replacing the engine and/or its components as a result of the Inlet Defect. Furthermore, the factual bases of MBUSA's misconduct are common to all Class Members and represent a common thread resulting in injury to the Class.

63.    <u>Commonality</u>:  There are numerous questions of law and fact common to Plaintiff and the Class that are susceptible to common answers and that predominate over any question affecting Class Members individually.  These common legal and factual issues include the following:

(a)    Whether Class Vehicles suffer from the Inlet Defect;

(b)    Whether the Inlet Defect constitutes an unreasonable safety risk;

(c)    Whether Defendant knew about the Inlet Defect and, if so, how long Defendant has known of the defect;

(d)    Whether the Inlet Defect constitutes a material fact;

(e)    Whether Defendant has had an ongoing duty to disclose the Inlet Defect to Plaintiff and Class Members;

(f)    Whether Plaintiff and the other Class Members are entitled to equitable relief, including a preliminary and/or a permanent injunction;

(g)     Whether Defendant knew or reasonably should have known of the Inlet Defect before it sold and leased Class Vehicles to Class Members;

(h)     Whether Defendant should be declared financially responsible for notifying the Class Members of Inlet Defect and for the costs and expenses of repairing the Inlet Defect;

(i)     Whether Defendant is obligated to inform Class Members of their right to seek reimbursement for having paid to diagnose, repair, or replace components as a result of the Inlet Defect;

(j)     Whether Defendant breached the implied warranty of merchantability pursuant to the Magnuson-Moss Warranty Act;

(k)     Whether Defendant breached the implied warranty of merchantability pursuant to the Song-Beverly Act

(l)     Whether Defendant breached its express warranties under UCC section 2301;

(m)     Whether Defendant breached written warranties pursuant to the Magnuson-Moss Warranty Act; and

(n)     Whether Defendant has acted or refused to act on grounds that apply generally to the Class or Sub-classes.

64.     Adequate Representation:  Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiff has retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiff intends to vigorously prosecute this action.

65.     Predominance and Superiority:  Plaintiff and Class Members have all suffered, and will continue to suffer, harm and damages as a result of Defendant's unlawful and wrongful conduct. A class action is superior to other available

methods for the fair and efficient adjudication of the controversy.  Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendant's misconduct. Absent a class action, Class Members will continue to incur damages, and Defendant's misconduct will continue unabated without remedy or relief.  Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that it will conserve the resources of the courts and the litigants and promote consistency and efficiency of adjudication.

**FIRST CAUSE OF ACTION**

**(Violation of California's Consumers Legal Remedies Act,**

**California Civil Code § 1750, *et seq*.)**

**(On Behalf of the CLRA Sub-Class)**

66.    Plaintiff Hadjian incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

67.    Plaintiff Hadjian brings this cause of action on behalf of himself and the CLRA Sub-Class.

68.    Defendant is a "person" as defined by California Civil Code § 1761(c).

69.    Plaintiff Hadjian and the CLRA Sub-Class members are "consumers" within the meaning of California Civil Code § 1761(d) because they purchased or leased their Class Vehicles primarily for personal, family, or household use.

70.    By failing to disclose and concealing the Inlet Defect from Plaintiff Hadjian and prospective CLRA Sub-Class members, Defendant violated

29

California Civil Code § 1770(a), as it represented that the Class Vehicles and their bumper covers and air inlets had characteristics and benefits that they do not have, and represented that the Class Vehicles and the bumper covers and air inlets were of a particular standard, quality, or grade when they were of another. *See* Cal. Civ. Code §§ 1770(a)(5) & (7).

71.    Defendant's unfair and deceptive acts or practices occurred repeatedly in Defendant's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

72.    Defendant knew that the Class Vehicles and their bumper covers and air inlets suffered from an inherent defect, were defectively designed, manufactured, used improper materials, and were not suitable for their intended use.

73.    As a result of their reliance on Defendant's omissions, owners and/or lessees of the Class Vehicles, including Plaintiff Hadjian, suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Inlet Defect, Plaintiff Hadjian and the CLRA Sub-Class members were harmed and suffered actual damages in that the Inlet Defect results in a serious risk that the radiators, engine and their components will fail or be damaged before their expected useful life has run.

74.    Defendant was under a duty to Plaintiff Hadjian and the CLRA Sub-Class members to disclose the defective nature of the bumper covers and air inlets and/or the associated repair costs because:

> (a)    Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles' bumper covers and air inlets;

> (b)    Plaintiff Hadjian and the CLRA Sub-Class members could not

reasonably have been expected to learn or discover that their bumper covers and air inlets had a dangerous safety defect until it manifested; and

(c)   Defendant knew that Plaintiff Hadjian and the CLRA Sub-Class members could not reasonably have been expected to learn of or discover the safety defect.

75.   In failing to disclose the Inlet Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

76.   The facts Defendant concealed from or failed to disclose to Plaintiff Hadjian and the CLRA Sub-Class members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Class Vehicles or pay less. Had Plaintiff Hadjian and the CLRA Sub-Class members known that the Class Vehicles' engine was defective, they would not have purchased or leased the Class Vehicles or would have paid less for them.

77.   Plaintiff Hadjian and the CLRA Sub-Class members are reasonable consumers who do not expect that their vehicles would exhibit problems such as the Inlet Defect. This is the reasonable and objective consumer expectation relating to a vehicle.

78.   As a result of Defendant's conduct, Plaintiff Hadjian and the CLRA Sub-Class members were harmed and suffered actual damages in that the Class Vehicles experienced and will continue to experience problems such as the Inlet Defect.

79.   As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Plaintiff Hadjian and the CLRA Sub-Class members suffered and will continue to suffer actual damages.

80.   Plaintiff Hadjian and the CLRA Sub-Class members are entitled to

equitable relief.

81.    Plaintiff Hadjian has provided Defendant with notice of its violations of the CLRA pursuant to California Civil Code § 1782(a).  Plaintiff Hadjian seeks monetary, compensatory, and punitive damages, as well as injunctive and equitable relief.

## SECOND CAUSE OF ACTION

### (Breach of Implied Warranty Pursuant to Song-Beverly Consumer Warranty Act, California Civil Code §§ 1792 and 1791.1, *et seq.*)

### (On Behalf of the Implied Warranty Sub-Class)

82.    Plaintiff Hadjian incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

83.    Plaintiff Hadjian brings this cause of action against Defendant on behalf of himself and the Implied Warranty Sub-Class.

84.    Defendant was at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles.  Defendant knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

85.    Defendant provided Plaintiff Hadjian and the Implied Warranty Sub-Class members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.  However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, *inter alia*, the Class Vehicles and their bumper covers and inlets suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

86.    Defendant impliedly warranted that the Class Vehicles were of merchantable quality and fit for their intended use.  This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their

bumper covers and inlets, which were manufactured, supplied, distributed, and/or sold by MBUSA, would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles and their bumper covers and inlets would be fit for their intended use.

87.    Contrary to the applicable implied warranties, the Class Vehicles and their bumper covers and inlets at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff Hadjian and the Implied Warranty Sub-Class members with reliable, durable, and safe transportation.  Instead, the Class Vehicles are defective, including the defective bumper covers and inlets.

88.    The alleged Inlet Defect is inherent and was present in each Class Vehicle at the time of sale.

89.    As a result of Defendant's breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Inlet Defect, Plaintiff Hadjian and the Implied Warranty Sub-Class members were harmed and suffered actual damages in that the Class Vehicles' bumper covers and inlets and/or its components are substantially certain to fail before their expected useful life has run.

90.    Defendant's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of California Civil Code §§ 1792 and 1791.1.

## THIRD CAUSE OF ACTION

**(Breach of Express Warranty under the Magnuson-Moss Warranty Act,**

**15 U.S.C. § 2303 *et seq*.)**

**(On Behalf of the Class)**

91.    Plaintiff Hadjian incorporates by reference the allegations contained

in the preceding paragraphs of this Complaint.

92.    Plaintiff Hadjian brings this cause of action on behalf of himself and on behalf of the Class against Defendant.

93.    Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described *infra*, which became a material part of the bargain. Accordingly, Defendant's express warranty is an express warranty under California law.

94.    The bumper covers, inlets, and their component parts were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

95.    According to MBUSA, "The New Vehicle Limited Warranty period is four (4) years or 50,000 miles, whichever occurs first, except as specified in the section entitled "Limited Coverage."

96.    The warranty contains the following statements:

> (a)    "Your vehicle is covered under the terms of these warranties and your authorized Mercedes-Benz Center will exchange or repair any defective parts in accordance with the terms of such warranties within stated limits."

> (b)    "DEFECTS: Mercedes-Benz USA, LLC (MBUSA) warrants to the original and each subsequent owner of a new Mercedes-Benz vehicle that any authorized Mercedes-Benz Center will make any repairs or replacements necessary to correct defects in material or workmanship arising during the warranty period."

97.    Defendant breached the express warranties by selling and leasing Class Vehicles with bumper covers and inlets that were defective, requiring repair or replacement within the warranty period, and refusing to honor the express

warranty by repairing or replacing, free of charge, the bumper covers, inlets, engine, radiator and their component parts.  MBUSA has failed to "repair" the defects as alleged herein.

98.    Plaintiff Hadjian was not required to notify MBUSA of the breach or was not required to do so because affording MBUSA a reasonable opportunity to cure its breach of written warranty would have been futile. Defendant was also on notice of the defect from complaints and service requests it received from Class Members, from repairs and/or replacements of the bumper covers, inlets, engines, radiators, and from other internal sources.

99.    As a direct and proximate cause of Defendant's breach, Plaintiff and the other Class members have suffered, and continue to suffer, damages, including economic damages at the point of sale or lease. Additionally, Plaintiff and the other Class members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

100.    Plaintiff Hadjian and the other Class members are entitled to legal and equitable relief against Defendant, including actual damages, consequential damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

## FOURTH CAUSE OF ACTION

### (Breach of Implied Warranty under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2303 *et seq*.)

### (On Behalf of the Class)

101.    Plaintiff Hadjian incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

102.    Plaintiff Hadjian brings this cause of action on behalf of himself and the Class against Defendant.

103.    The Class Vehicles are a "consumer product" within the meaning of

the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

104.    Plaintiff Hadjian and Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

105.    Defendant is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

106.    MBUSA impliedly warranted that the Class Vehicles were of merchantable quality and fit for use.  This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their bumper covers, inlets, radiators and engines were manufactured, supplied, distributed, and/or sold by MBUSA would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles and their bumper covers and inlets would be fit for their intended use while the Class Vehicles were being operated.

107.    Contrary to the applicable implied warranties, the Class Vehicles and their bumper covers and inlets at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and Class members with reliable, durable, and safe transportation.  Instead, the Class Vehicles are defective, including the Inlet Defect.

108.    Defendant's breach of implied warranties has deprived Plaintiff Hadjian and Class members of the benefit of their bargain.

109.    The amount in controversy of Plaintiff Hadjian's individual claims meets or exceeds the sum or value of $25,000.  In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

110.    Defendant has been afforded a reasonable opportunity to cure its breach, including when Plaintiff Hadjian and Class members brought their vehicles in for diagnoses and repair of the Inlet Defect.

111.    As a direct and proximate cause of Defendant's breach of implied

warranties, Plaintiff Hadjian and Class members sustained and incurred damages and other losses in an amount to be determined at trial. Defendant's conduct damaged Plaintiff Hadjian and Class members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, and/or other relief as appropriate.

112.   As a result of Defendant's violations of the Magnuson-Moss Warranty Act as alleged herein, Plaintiff Hadjian and Class members have incurred damages.

**FIFTH CAUSE OF ACTION**

**(For Unjust Enrichment)**

**(On Behalf of the Class)**

113.   Plaintiff Hadjian incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

114.   Plaintiff Hadjian brings this cause of action on behalf of himself and the Class.

115.   As a direct and proximate result of Defendant's failure to disclose known defects, Defendant has profited through the sale and lease of the Class Vehicles. Although these vehicles are purchased and leased through Defendant's agents, the money from the vehicle sales flows directly back to Defendant.

116.   Additionally, as a direct and proximate result of Defendant's failure to disclose known defects in the Class Vehicles, Plaintiff and Class Members have vehicles that require repeated, high-cost repairs that can and therefore have conferred an unjust substantial benefit upon Defendant.

117.   Defendant has been unjustly enriched due to the known defects in the Class Vehicles through the use money paid that earned interest or otherwise added to Defendant's profits when said money should have remained with Plaintiff and Class Members.

118.   As a result of the Defendant's unjust enrichment, Plaintiff and Class Members have suffered damages.

## SIXTH CAUSE OF ACTION

### (Violation of California Business & Professions Code § 17200, *et seq.*)
### (On Behalf of the California Sub-Class)

119.   Plaintiff Hadjian incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

120.   Plaintiff Hadjian brings this cause of action on behalf of himself and the California Sub-Class.

121.   As a result of their reliance on Defendant's omissions, owners and/or lessees of the Class Vehicles, including Plaintiff Hadjian, suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Inlet Defect, Plaintiff Hadjian and the California Sub-Class members were harmed and suffered actual damages in that the Class Vehicles' bumper covers, inlets, radiators, engine and/or their components are substantially certain to fail before their expected useful life has run.

122.   California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

123.   Plaintiff Hadjian and the California Sub-Class members are reasonable consumers who do not expect their vehicles to exhibit problems such as the Inlet Defect.

124.   Defendant knew the Class Vehicles suffered from the Inlet Defect and were not suitable for their intended use.

125.   In failing to disclose the Inlet Defect, Defendant has knowingly and intentionally concealed material facts and breached its duty not to do so.

126.   Defendant was under a duty to Plaintiff Hadjian and the California

Sub-Class members to disclose the defective nature of the Class Vehicles and their bumper covers and inlets because:

      (a)    Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles; and

      (b)    Defendant actively concealed the defective nature of the Class Vehicles from Plaintiff Hadjian and the California Sub-Class.

127.   The facts Defendant concealed from or failed to disclose to Plaintiff Hadjian and the California Sub-Class members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease Class Vehicles.  Had they known of the Inlet Defect, Plaintiff Hadjian and the other California Sub-Class members would have paid less for Class Vehicles equipped with the defective bumper covers and inlets or would not have purchased or leased them at all.

128.   Defendant continued to conceal the defective nature of the Class Vehicles even after Plaintiff Hadjian and the other California Sub-Class members began to report problems.

129.   Defendant's conduct was and is likely to deceive consumers.

130.   Defendant's acts, conduct, and practices were unlawful, in that they constituted:

      (a)    Violations of California's Consumers Legal Remedies Act;

      (b)    Violations of the Song-Beverly Consumer Warranty Act;

      (c)    Violations of the Magnuson-Moss Warranty Act; and

      (d)    Breach of Express Warranty under California Commercial Code § 2313.

131.   By its conduct, Defendant has engaged in unfair competition and unlawful, unfair, and fraudulent business practices.

132.   Defendant's unfair or deceptive acts or practices occurred repeatedly

in Defendant's trade or business and were capable of deceiving a substantial portion of the purchasing public.

133.    As a direct and proximate result of Defendant's unfair and deceptive practices, Plaintiff Hadjian and the other California Sub-Class members have suffered and will continue to suffer actual damages.

134.    Defendant has been unjustly enriched and should be required to make restitution to Plaintiff Hadjian and the other California Sub-Class members pursuant to §§ 17203 and 17204 of the Business & Professions Code.

## RELIEF REQUESTED

135.    Plaintiff, on behalf of himself and all others similarly situated, requests the Court to enter judgment against Defendant, as follows:

(a)    An order certifying the proposed Class and Sub-Classes, designating Plaintiff as named representative of the Class, and designating the undersigned as Class Counsel;

(a)    A declaration that Defendant is financially responsible for notifying all Class Members of the Inlet Defect;

(b)    An order enjoining Defendant from further deceptive distribution, sales, and lease practices with respect to Class Vehicles; compelling Defendant to issue a voluntary recall for the Class Vehicles pursuant to 49 U.S.C. § 30118(a); compelling Defendant to repair and eliminate the Inlet Defect from every Class Vehicle; enjoining Defendant from selling the Class Vehicles with the misleading information; and/or compelling Defendant to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed;

(c)     A declaration requiring Defendant to comply with the various provisions of the Song-Beverly Act alleged herein and to make all the required disclosures;

(d)     An award to Plaintiff and the Class for compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial;

(e)     Any and all remedies provided pursuant to the Song-Beverly Act, including California Civil Code section 1794;

(f)     Any and all remedies provided pursuant to the Magnuson-Moss Warranty Act;

(g)     A declaration that Defendant must disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from the sale or lease of its Class Vehicles or make full restitution to Plaintiff and Class Members;

(h)     An award of attorneys' fees and costs, as allowed by law;

(i)     An award of attorneys' fees and costs pursuant to California Code of Civil Procedure § 1021.5;

(j)     An award of pre-judgment and post-judgment interest, as provided by law;

(k)     Leave to amend the Complaint to conform to the evidence produced at trial; and

(l)     Such other relief as may be appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

136.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all issues in this action so triable.

Dated:  January 29, 2021

Respectfully submitted,


**BERGER MONTAGUE PC**


/s/ E. Michelle Drake
E. Michelle Drake
Georgia Bar No. 229202
BERGER MONTAGUE PC
43 SE Main Street, Suite 505
Minneapolis, Minnesota 55414
T: (612) 594-5999
F: (612) 584-4470
emdrake@bm.net

Russell D. Paul*
Glen L. Abramson*
Amey J. Park*
Abigail J. Gertner*
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.:   (215) 875-3000
Fax:   (215) 875-4604
emdrake@bm.net
rpaul@bm.net
gabramson@bm.net
apark@bm.net
agertner@bm.net

*_pro hac vice_ application forthcoming

Steven R. Weinmann*
Tarek H. Zohdy*
Cody R. Padgett*
CAPSTONE LAW APC
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Tel: (310) 556-4811
Fax: (310) 943-0396
Steven.Weinmann@capstonelawyers.com
Tarek.Zohdy@capstonelawyers.com

Cody.Padgett@capstonelawyers.com

_____

## CERTIFICATION OF COUNSEL

_____

I hereby certify that the foregoing COMPLAINT has been prepared with Times

New Roman, 14-point font, one of the font and point selections approved by the

Court in LR 5.1.

/s/ E. Michelle Drake

E. Michelle Drake
Georgia Bar No. 229202
emdrake@bm.net